# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE PLUG POWER INC.    )
STOCKHOLDER DERIVATIVE    )  C.A. No. 2022-0569-KSJM
LITIGATION    )

## MEMORANDUM OPINION

Date Submitted: November 15, 2024
Date Decided: May 2, 2025

Seth D. Rigrodsky, Gina M. Serra, Herbert Mondros, RIGRODSKY LAW, P.A., Wilmington, Delaware; Lee Squitieri, SQUITIERI & FEARON, LLP, New York, New York; Fletcher Moore, Justin Kuehn, MOORE KUEHN, PLLC, New York, New York; *Counsel for Plaintiffs Abbas Khambati and Anne D. Graziano, Trustee.*

Rudolf Koch, Kyle Lachmund, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants George McNamee, Andrew Marsh, Maureen Helmer, Gregory Kenausis, Gary Willis, Johannes Roth, Lucas Schneider Jonathan Silver, Paul Middleton, Gerard Conway, Jr., and Keith Schmid.*

Ronald N. Brown, III, Peter H. Kyle, DLA PIPER LLP (US), Wilmington, Delaware; John J. Clarke, Jr., DLA PIPER LLP (US), New York, New York; Yan Grinblat, DLA PIPER LLP (US), Chicago, Illinois; *Counsel for Nominal Defendant Plug Power Inc.*

**McCORMICK, C.**

Amazon, Inc. is one of Plug Power, Inc.'s best customers. In 2017, Plug Power agreed to provide Amazon a warrant to acquire Plug Power shares that vested in three tranches based on Amazon's purchase of up to $600 million of Plug Power's goods and services. Warrant shares in the third tranche were scheduled to begin vesting in the fall of 2020. In November 2020, Plug Power's board of directors authorized management to attempt to negotiate an agreement with Amazon to accelerate the vesting of the third tranche of warrant shares. There were business reasons for this decision, but also downsides—accelerated vesting would result in a substantial, one-time non-cash accounting charge. Negotiations were successful. On December 31, 2020, Plug Power and Amazon executed an agreement to waive the vesting conditions on the remaining warrants. Plug Power announced the agreement on January 5, 2021. On February 25, 2021, Plug Power issued a press release announcing its preliminary, unaudited fourth quarter 2020 results, which included the approximate $412.7 million accounting charge associated with the agreement to accelerate vesting. Plug Power's stock price fell $6.82, or more than 13.5%, on this news.

The plaintiffs own Plug Power stock. They assert *Brophy*[1] claims challenging insider trades that occurred between November 6, 2020 and January 19, 2021. They allege that the Amazon negotiations and ultimate vesting agreement constituted material, nonpublic information, and that the defendants sold stock based on that

---

[1] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

information.  They also assert *Caremark*[2] claims alleging that the board failed to adequately monitor or respond to red flags of insider trading.  They separately advance *Caremark* claims challenging the board systems for responding to SEC comment letters.

The plaintiffs' *Brophy* and *Caremark* claims are derivative, and the defendants have moved to dismiss them under Court of Chancery Rule 23.1 for failure to plead demand futility.  The defendants have also moved to dismiss the *Brophy* and *Caremark* claims under Court of Chancery Rule 12(b)(6) for failure to state a claim. The plaintiffs argue that the Plug Power directors relevant to the demand futility analysis cannot impartially consider a demand because the majority of them face a substantial likelihood of liability in connection with the *Brophy* and *Caremark* claims. The plaintiffs do not allege particularized facts sufficient to support these arguments. This decision therefore grants the motion to dismiss under Rule 23.1.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Stockholder Derivative Complaint (the "Amended Complaint") and the documents it incorporates by reference.[3]

### A.    Plug Power And The Amazon Warrant

Plug Power (or the "Company") is a Delaware corporation that manufactures fuel cells that produce electricity using hydrogen and replace conventional batteries,

---

[2] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[3] Cons. C.A. No. 2022-0569-KSJM, Docket ("Dkt.") 25 ("Am. Compl.").

particularly those used to power motor vehicles. Plug Power's largest customers include Amazon, which uses its fuel cell systems in its retail distribution and manufacturing businesses, primarily for warehouse forklifts.

In April 2017, Plug Power announced it had agreed to issue Amazon a warrant (the "Warrant") to acquire 55,886,696 shares (the "Warrant Shares") of Plug Power's common stock (the "Amazon Agreement"). The Amazon Agreement was part of a larger commercial arrangement governing Amazon's future orders of Plug Power's goods and services. The Warrant Shares vested based on Amazon's purchase of up to $600 million of Plug Power's goods and services.

Under the Amazon Agreement, the Warrant Shares vested in three tranches. The first tranche of 5,819,652 Warrant Shares vested immediately upon execution of the Warrant and other transaction documents. The exercise price for the first tranche was $1.1893 per share.

The second tranche of 29,098,260 Warrant Shares vested in four equal installments of 7,274,565 shares, each triggered by Amazon's aggregate payment of $50 million on Plug Power's goods and services. The exercise price for the second tranche was the same as the first.

The third tranche of 20,368,784 Warrant Shares took hold after $200 million in payments exhausted the second tranche. The third tranche vested in eight equal installments of 2,546,098 Warrant Shares, keyed to each additional $50 million Amazon spent in Plug Power purchases. The exercise price for the third tranche of Warrant Shares was an amount per share equal to 90% of the 30-day volume

3

weighted average share price of the common stock as of the final vesting date of the second tranche of Warrant Shares.

### B. The Board Authorizes Management To Offer Amazon Accelerated Vesting.

By the third quarter of 2020, Amazon nearly had completed the $200 million in purchases required for the second tranche to vest. Also in the third quarter of 2020, the trading price of Plug Power's stock had increased by 63%. This was good in many ways, but it was expected to increase the accounting charges booked to Plug Power in connection with the third tranche of Warrant Shares.

Plug Power's CFO Paul Middleton provided a detailed update regarding the status of the Warrant during a meeting of the Plug Power Board of Directors (the "Board") on October 20 and 21, 2020.

Plug Power held another Board meeting on November 6, 2020. Middleton and a Board member Andrew Marsh, who was Plug Power's CEO and President, updated the Board regarding the status of the Warrant Shares. They recommended that Plug Power accelerate the remaining tranche of outstanding but unvested Warrant Shares. They stated that acceleration "would allow for clearer presentation of the Company financials going forward and would eliminate the 'overhang' with respect to the financial disclosures that would otherwise occur."[4]

---

[4] *Id.* ¶ 127.

## C. Insiders Sell.

The Company has an Insider Trading Policy, which it revised on February 25, 2020. The Insider Trading Policy provides that it is "illegal for any director, officer or employee of Plug Power . . . to trade in the securities of the Company while in the possession of material, non-public information about the Company."[5]

The Insider Trading Policy further provides that no insider may trade outside of designated trading windows and must receive pre-clearance from the Company's Compliance Officer. The only exception to the general prohibition is for trades effected pursuant to a written contract, instruction, or plan that both complies with Rule 10b5-1 of the Securities Exchange Act of 1934 and has been pre-approved by the Compliance Officer. Rule 10b5-1 plans can be modified only during a trading window.

In November and December 2020, Defendants made the following sales of Plug Power stock:

- Board Chairman McNamee sold 30,000 shares on November 9, 2020, at $21.05 per share, yielding $631,500 in proceeds.

- Director Jonathan Silver sold 42,576 shares on November 9, 2020, at $20.00 per share, yielding $851,520 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective September 14, 2020. The stock options he exercised to sell these shares were set to expire in 2028 and 2029.

- Chief Operating Officer Keith Schmid sold 83,333 shares on November 12, 2020, at $22.84 per share, yielding $1,903,325 in proceeds. At least some of these sales resulted from Schmid converting options expiring in 2026. On December 17, 2020, Schmid sold 200,000 shares of Plug Power stock at $30 per share, yielding $6,000,000 in proceeds. These sales resulted from Schmid converting options expiring in October 2023. The shares were sold pursuant to a 10b5-1 plan effective November 12, 2020.

---

[5] *Id.* ¶ 46.

5

- Director Johannes Roth, acting through FiveT Capital Holding (where he is a managing director and equity officer), sold 1,915,034 shares on November 13, 2020, at prices from $22.93 to $23.42 per share, yielding approximately $44,390,488.12 in proceeds.

- Director Lucas Schneider sold 333,333 shares on December 14, 2020, at prices from $26.23 to $27.03 per share, yielding approximately $8,876,657.79 in proceeds.[6] The stock options he exercised to sell these shares were set to expire in 2026 and 2028.

- Director Maureen Helmer sold 15,311 shares on December 14, 2020, at prices from $26.11 to $27.13 per share, yielding approximately $407,578.82 in proceeds. On December 17, 2020, Helmer sold 10,000 shares at $30 per share, yielding $300,000 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective August 19, 2020.

- Director Gary Willis sold 91,200 shares on December 11, 2020, at prices from $26.74 to $27.46 per share, yielding approximately $2,471,520 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective November 11, 2020. The stock options he exercised to sell these shares were set to expire in May 2021 (1200), September 2021 (65,000), May 2022 (10,000), and June 2023 (12,000).

- CFO Middleton sold 216,667 shares on December 24, 2020, at $35.13 per share, yielding $7,611,511.71 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective September 2, 2020. The stock options he exercised to sell these shares were set to expire in 2028 and 2029.

- Director Gregory Kenausis sold 55,000 shares on December 28, 2020, at prices from $33.91 to $37.05 per share, yielding approximately $1,951,400 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective September 10, 2020.

### D. The Company Discloses Amazon's Agreement To Accelerated Vesting.

On January 5, 2021, Plug Power filed a Form 8-K with the SEC revealing that the Company waived the remaining vesting conditions under the Warrant on

---

[6] Defendants dispute this allegation. *See* Dkt. 32 ("Defs.' Opening Br.") at 21 n.6. This discrepancy does not make a different in the court's analysis.

6

December 31, 2020. This waiver resulted in vesting the remaining 20,368,784 unvested Warrant Shares. The Form 8-K stated that:

> This vesting is expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020, to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward. The details of the warrant and vesting will be described in the Company's annual report on Form 10-K for the year ending December 31, 2020 to be filed by the Company with the Securities and Exchange Commission (the "SEC").[7]

## E. More Insiders Sell.

In January 2021, the following insiders sold additional Plug Power shares:

- General Counsel Gerard Conway sold 108,333 shares on January 4, 2021, at prices from $31.94 to $34.58 per share. Conway also sold 33,333 shares each day on January 8 and 9, 2021, at $52.07 and $43.68 per share.[8] These three days of sales yielded approximately $6,794,790.33 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective March 16, 2020. Conway's January 4 sales resulted from his exercising stock options set to expire in August 2027. Conway's January 8 and 9 sales resulted from his exercising stock options set to expire in 2029.

- Schneider sold 2,500 shares on January 4, 2021, at prices from $31.84 to $35.88 per share, yielding approximately $84,650 in proceeds.[9] The shares were sold pursuant to a 10b5-1 plan effective June 15, 2020.

---

[7] Am. Compl. ¶ 174; Defs.' Opening Br., Ex. 31.

[8] Defendants dispute that Conway sold shares on January 9, 2021, and submit an exhibit supporting that the sale occurred on January 7, 2021. Defs.' Opening Br. at 22 n.7 (citing Defs.' Opening Br., Ex. 44). This discrepancy does not make a difference in the court's analysis.

[9] Defendants assert that the Amended Complaint incorrectly alleges that Schneider sold 2,500 shares on January 4 and submit an exhibit showing that Schneider sold 3,500 shares at prices from $31.84 to $33.88 per share. Defs.' Opening Br. at 21 n.5 (citing Defs.' Opening Br., Ex. 41). This discrepancy is immaterial with respect to the court's analysis below.

7

- McNamee sold 40,000 shares between January 6 and 13, 2021, at prices from $35.00 to $70.45 per share, yielding approximately $2,199,200 in proceeds.

- Silver sold 1,780 shares on January 11, 2021, at $48.92 per share, yielding approximately $87,077.60 in proceeds.[10]

- Marsh sold 573,268 shares on January 19, 2021, at prices from $62.65 to $68.31 per share, yielding approximately $36,100,000 in proceeds. The shares were sold pursuant to a 10b5-1 plan effective on December 2, 2020. The stock options he exercised to sell these shares were set to expire in 2027.

**F.** **The Company Discloses The Accounting Charge For The Accelerated Vesting.**

On February 23 and 24, 2021, the Board convened before the Company reported earnings for the fourth quarter and full year of 2020. Middleton presented the financial results and informed the Board that KPMG's year end audit would be finalized in the days to come with the Form 10-K to be filed on March 1, 2021.

The Company released its fourth quarter and full year 2020 financial results in a letter to shareholders on February 25. The letter disclosed the $412.7 million in charges associated with the agreement to accelerate vesting of the Warrant Shares, as compared to one analyst's estimate of $8.9 million in warrant provision costs. The letter also disclosed the Company reporting a negative $316.3 million in revenue for the quarter, as compared to the analyst consensus forecast of $87.2 million.

On the Company's fourth quarter 2020 earnings call the same day, Marsh stated that the Company "accelerated warrants at the end of 2020 . . . . [which] caused a large onetime noncash charge but clears the deck for the future and quite a

---

[10] The Amended Complaint appears to contain a typographical error in the calculation of Silver's proceeds. This decision calculates the approximate amount.

future."[11]  The Company's stock price fell after this announcement by approximately 13.6%.

### G.     Plug Power Restates Its Financials.

The Company received five comment letters from the SEC between mid-2018 and early 2021.  The letters were dated September 5, 2018, April 24, 2019, June 20, 2019, December 16, 2020, and February 10, 2021.  The Company responded to the letters on September 19, 2018, May 8, 2019, July 5, 2019, and January 14, 2021.[12] The allegations reflect that the Audit Committee discussed SEC letters during that period, although there is scant mention of those letters in the minutes.[13]

The letters covered many issues.  One of the recurring issues that the SEC identified in its letters was the Company's presentation of revenue and gross profit on a gross basis excluding the effects of the provision for the fair value of warrants issued as sales incentives.  The SEC also repeatedly criticized the Company's presentation of non-GAAP measures instead of or with greater prominence than the directly comparable GAAP measures.  One of these non-GAAP measures included "adjusted EBITDA," which the SEC directed the Company to describe as a liquidity

---

[11] Am. Compl. ¶ 220.

[12] The Amended Complaint alleges that Plug Power did not respond to the February 10, 2021 SEC comment letter until almost four months later, but it is unclear whether this is correct, given that the Amended Complaint references a June 1, *2020* letter. Am. Compl. ¶ 211.  The Amended Complaint also alleges that the SEC's Edgar system does not contain, nor did Plug Power publicly disclose, any response to the February 10, 2021 comment letter.  The parties did not brief this issue nor submit exhibits supporting or refuting it, and it is immaterial to the court's analysis.

[13] Dkt. 35 ("Pls.' Answering Br.") at 8–9, 38–39 (citing Defs.' Opening Br., Exs. 5, 23).

measure rather than a performance metric. The SEC also flagged issues with Plug Power's lease and lease financing accounting, and other accounting-related items.

On March 2, 2021, the Company filed a notification of late filing with the SEC, stating that it could not timely file its Form 10-K for 2020 because it was completing a review and assessment of items in its financial statements. On March 16, 2021, Plug Power issued a press release announcing that the Company needed to restate its prior financial results for fiscal years 2018 and 2019, and quarterly filings for 2019 and 2020. The press release also stated that the Company would not be able to file its 2020 Form 10-K by the March 16, 2021 deadline but was endeavoring to finalize the restatement of the financial statements and file its Form 10-K as soon as possible.

The next trading day following Plug Power's announcement, the Company's stock price fell $3.35 per share, or approximately 7.8%, on unusually heavy trading volume.

On May 14, 2021, Plug Power announced that the Company had completed its restatement of historical financial statements for 2018, 2019, and the earlier quarters of 2020 (the "Restatement"), and filed its 2020 Form 10-K. The Restatement accounted for, among other things, improper presentation of research and development expenses; presentation of operating expenses; accounting for lease-related transactions; identification and evaluation of impairment, loss contract accrual, certain expense accruals, and dividends; and timely identification of adjustments to physical inventory in interim periods. In its 2020 Form 10-K, the

10

Company also revealed that there were items improperly presented for the fiscal years 2016 and 2017.

As part of its exchange with the SEC, the Company sent a letter on August 20, 2021. The letter stated that, as of December 31, 2020, the Company's internal forecasts showed that it expected only $124.4 million in probable revenues from Amazon. This meant that Plug Power would write off approximately $57 million of costs for the Warrant at a lower November 2, 2020 value of $10.57 per warrant (as later revealed in the Company's 2020 Form 10-K). According to Plaintiffs, however, Middleton knew that the charge for the unvested 12.73 million Warrant Shares was $343 million at the December 31, 2020 fair value of $26.95 per Warrant Share. In other words, at least one Defendant knew as early as December 31, 2020, the likely magnitude of the accounting charge that the Company incurred for accelerating vesting of the Warrant.

### H.     This Litigation

Plaintiff Abbas Khambati filed this action on June 29, 2022, against McNamee, Willis, Helmer, Marsh, Roth, Kenausis, Schneider, Silver, Middleton, Conway, and Schmid (collectively, "Defendants").[14] In July 2022, the parties stipulated to stay this action pending resolution of a parallel securities class action (the "Securities Action") before the United States District Court for the Southern District of New York (the "District Court").

---

[14] Dkt. 1.

11

On July 19, 2022, Plaintiff Anne D. Graziano, Trustee, Anne D. Graziano Revocable Living Trust (with Khambati, "Plaintiffs") filed a Verified Derivative Complaint on behalf of the Company against Defendants.[15] On August 9, 2022, the parties stipulated to consolidating the related shareholder derivative actions, appointing co-lead counsel, and staying the consolidated action.[16]

On August 29, 2023, the District Court dismissed the Securities Action with prejudice.[17] On October 13, 2023, the parties informed this court that Plaintiffs intended to proceed with this litigation.[18]

On March 8, 2024, Plaintiffs filed their Amended Complaint.[19] It contains three Counts. In Count I, Plaintiffs claim that Defendants used material nonpublic information for their own financial benefit in breach of their fiduciary duties (the "*Brophy* claim"). In Count II, Plaintiffs claim that Defendants breached their fiduciary duties based on the allegations generally asserted in the Amended Complaint and for intentionally or recklessly allowing Defendants to trade Company stock based on material nonpublic information (the "*Caremark* claims"). In Count III, Plaintiffs plead unjust enrichment (the "Unjust Enrichment claim") and seek disgorgement.

---

[15] C.A. No. 2022-0629-KSJM, Dkt. 1.

[16] Dkt. 5.

[17] Dkt. 21.

[18] Dkt. 22.

[19] Dkt. 25.

Defendants moved to dismiss the Amended Complaint on May 10, 2024.[20] The parties completed briefing on July 24, 2024,[21] and the court heard argument on November 4, 2024.[22]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss each of Plaintiffs' three Counts—the *Brophy* claim, the *Caremark* claims, and the Unjust Enrichment claim—under Rule 12(b)(6) for failure to state a claim. Each of Plaintiffs' claims are derivative, and Defendants have also moved to dismiss them under Rule 23.1 for failure to plead demand futility.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[23] "In a derivative

---

[20] Dkt. 32.

[21] Dkt. 41.

[22] Dkt. 51.

[23] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

13

suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[24] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[25] The demand requirement is a substantive principle under Delaware law.[26]

Rule 23.1 is the "procedural embodiment" of the demand requirement.[27] Under Rule 23.1, a derivative complaint must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort[.]"[28]

A stockholder can satisfy the demand requirement by pleading that demand is futile. To plead demand futility, the complaint must allege "particularized factual statements that are essential to the claim."[29] Although the requirement of factual particularity is a heightened pleading requirement, it "does not entitle a court to

---

[24] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[25] *Id.*

[26] *Id.*; *see* Ct. Ch. R. 23.1(a).

[27] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[28] Ct. Ch. R. 23.1(a)(1).

[29] *Brehm*, 746 A.2d at 254.

discredit or weigh the persuasiveness of well-pled allegations."[30]  If a plaintiff pleads

particularized facts, those factual allegations "are accepted as true" and "[p]laintiffs

are entitled to all reasonable factual inferences that logically flow from the

particularized facts alleged[.]"[31]

In *Zuckerberg*,[32] the Delaware Supreme Court adopted the "universal test" for

demand futility that blends elements of the two precursor tests: *Aronson*[33] and

*Rales*.[34]  When conducting a demand futility analysis under *Zuckerberg*, Delaware

courts ask, on a director-by-director basis:

> (i) whether the director received a material personal
> benefit from the alleged misconduct that is the subject of
> the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of
> liability on any of the claims that would be the subject of
> the litigation demand; and
>
> (iii) whether the director lacks independence from someone
> who received a material personal benefit from the alleged
> misconduct that would be the subject of the litigation
> demand or who would face a substantial likelihood of
> liability on any of the claims that are the subject of the
> litigation demand.[35]

---

[30] *Zuckerberg*, 250 A.3d at 877.

[31] *Id.* (citing cases).

[32] 262 A.3d 1034.

[33] 473 A.2d 805.

[34] 634 A.2d 927.

[35] *Zuckerberg*, 262 A.3d at 1059.

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[36] Although the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[37]

The demand analysis is conducted as to the board in place at the time that the claims at issue were "validly in litigation."[38] This rule protects representative plaintiffs by preventing defendants from recomposing a board after a derivative claim is filed to strengthen Rule 23.1 arguments.[39] Plaintiffs first asserted the *Brophy* and Unjust Enrichment claims in their original complaint, adding the *Caremark* claims through the Amended Complaint.[40] There is an argument, therefore, that the demand board relevant to the *Brophy* and Unjust Enrichment claims was the board

---

[36] *Id.*

[37] *Id.* In 2023, the Court of Chancery amended its rules to reflect the Delaware Supreme Court's adoption of the *Zuckerberg* test and modernize the language and presentation of the Rules to bring them closer in style to the Federal Rules of Civil Procedure. *See In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).

[38] *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006).

[39] *See Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) ("When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one."); *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *10 (Del. Ch. May 31, 2016) (describing as "problematic" a situation "where a manipulation of board composition is employed to discourage meritorious derivative litigation"), *aff'd sub nom. Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chicago on behalf of BioScrip, Inc. v. Smith*, 175 A.3d 621 (Del. 2017).

[40] *See* Dkt. 1 ¶¶ 216–224; Am. Compl. ¶¶ 333–336.

in place when the original complaint was filed,[41] and that the demand board relevant to the *Caremark* claims was the board in place when the Amended Complaint was filed.

Plaintiffs did not preserve that argument. Instead, they pled demand futility for all claims as to the board in place when they filed Amended Complaint.[42] Plaintiffs attempted to change tack in their answering brief.[43] But Defendants had relied on Plaintiffs' pleading to advance their dismissal arguments as to a fraction of the identified directors, failing to address three more that would have been in play had Plaintiffs identified the earlier board as the relevant board. Plaintiffs cannot shift boards at this stage.[44]

The board in place when Plaintiffs filed the Amended Complaint comprised Defendants McNamee, Willis, Helmer, Marsh, Kenausis, and non-parties Kyungyeol Song, Patrick Joggerst, Mark Bonney, and Kavita Mahtan (the "Demand Board").[45]

---

[41] That board comprised: Defendants McNamee, Willis, Helmer, Marsh, Roth, Kenausis, Schneider, and Silver, and non-parties Kimberly Harriman, Kyungyeol Song, Jean Bua, and Kavita Mahtan. Dkt. 1 ¶ 185.

[42] Am. Compl. ¶¶ 305–306. In briefing, Plaintiffs argue that the demand analysis should be run against the "current board," but they offer no explanation for that approach, which is inconsistent with Delaware law.

[43] Pls.' Answering Br. at 2 n.3.

[44] *Pers. Decisions, Inc. v. Bus. Plan. Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (quasi-estoppel "precludes [a party] from changing its position . . . in litigation to gain an advantage" or "asserting, to another's disadvantage, a right inconsistent with a position it has previously taken").

[45] Am. Compl. ¶ 305.

Given that the Demand Board comprised nine directors, to adequately allege demand futility, Plaintiffs must plead particularized facts creating reason to doubt that at least five of the nine were incapable of impartially considering a demand.[46] Plaintiffs do not advance arguments as to the non-parties.[47] They focus exclusively on McNamee, Willis, Helmer, Marsh, and Kenausis, all of whom engaged in challenged stock sales (the "Selling Directors"). Because Plaintiffs' arguments address only five of the nine Demand Board members, Plaintiffs must prevail as to each of the five Selling Directors to plead demand futility.

As to the Selling Directors, Plaintiffs advance arguments under *Zuckerberg*'s second prong, contending that each face substantial liability in connection with the claims. There is an argument under *Zuckerberg* prong one that the Selling Directors

---

[46] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

[47] The Amended Complaint includes a reference within a section titled "Disabling Relationships" to non-party Song's nomination to the Board as a designee of an investor with whom the Company has an Investor Agreement. Am. Compl. ¶ 319. But Plaintiffs do not explain why this nomination disables Song from exercising impartiality in considering a demand. Nor could they, as nomination by a particular person or entity, without more, does not render a director beholden. *See, e.g.*, *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 60 (Del. Ch. 2015) ("[T]he mere fact that . . . an alleged controlling stockholder, played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence.") (internal citation and quotation marks omitted). The Amended Complaint also alleges that demand on the four non-defendant directors would have been futile because they are beholden to Marsh and McNamee and they have not taken any steps to implement or enforce Plug Power's "Policy for Recoupment of Incentive Compensation." Am. Compl. ¶¶ 321–322. But Plaintiffs did not make any related arguments in their answering brief and therefore waived it. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

18

secured a material personal benefit from the challenged sales.[48] Plaintiffs, however, did not make that argument; they therefore waived it.[49]

Where, as here, a plaintiff's basis for arguing demand futility centers on a substantial likelihood of liability resulting from the derivative claims at issue, the demand analysis effectively folds into an analysis of the strength of the underlying claims as to the Demand Board members. In this case, therefore, the *Zuckerberg* analysis hinges on whether Plaintiff has stated a claim under Rule 12(b)(6) against the Demand Board.

The Rule 12(b)(6) standard in Delaware "is reasonable 'conceivability.'"[50] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[51] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[52]

---

[48] *See Grabski on behalf of Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *7 (Del. Ch. Feb. 1, 2024).

[49] *Emerald P'rs*, 726 A.2d at 1224.

[50] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[51] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[52] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

## A.    *Brophy*

Plaintiff brings *Brophy* claims against the Selling Directors.[53]   The relevant

facts are as follows:

- On November 9, 2020, McNamee sold 30,000 shares at $21.05 per share, yielding $631,500 in proceeds.   Between January 6 and 13, 2021, McNamee sold 40,000 shares at prices from $35.00 to $70.45 per share, yielding approximately $2,199,200 in proceeds.

- On December 11, 2020, Willis sold 91,200 shares at prices from $26.74 to $27.46 per share, yielding approximately $2,471,520 in proceeds.

- On December 14, 2020, Helmer sold 15,311 shares at prices from $26.11 to $27.13 per share, yielding approximately $407,578.82 in proceeds.  On December 17, 2020, Helmer sold 10,000 shares at $30 per share, yielding approximately $300,000 in proceeds.

- On December 28, 2020, Kenausis sold 55,000 shares at prices from $33.91 to $37.05 per share, yielding approximately $1,951,400 in proceeds.

- On January 19, 2021, Marsh sold 573,268 shares at prices from $62.65 to $68.31 per share, yielding approximately $36,100,000 in proceeds.

To state a claim under *Brophy*, a plaintiff must plead that the fiduciary:

(a) possessed material nonpublic information; and (b) used that information to make

trades because the defendants were motivated by the substance of that information

(the scienter requirement).[54]  The elements are conjunctive; each is essential.[55]

---

[53] Plaintiff also asserts *Brophy* claims against three former Company directors (Roth, Schneider, and Silver), and three Company officers (Middleton, Conway, and Schmid).  This *Zuckerberg* prong-two Rule 12(b)(6) analysis, however, focuses on the claims against the Selling Directors.

[54] *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004); *see also Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003).

[55] *Oracle*, 867 A.2d at 934 (To state a claim under *Brophy*, a plaintiff must allege that not only the fiduciary possessed material, nonpublic company information, but also that "the corporate fiduciary used that information improperly by making trades

In briefing, Plaintiffs relied on a single and broad category of allegedly material nonpublic information: information related to the Board's decision to authorize management to negotiate with Amazon and ultimate agreement to accelerate vesting, ranging from the November 6 Board decision to the February 25 announcement of the accounting charge.[56]  This decision assumes, solely for the sake of analysis, that everything in this broad category material and nonpublic, at least until disclosed on February 25, 2021.  The analysis turns to address whether Plaintiffs allege particularized facts from which the court can infer that the Selling Directors traded on this information.

This court considers a variety of factors when evaluating whether a plaintiff has adequately alleged the scienter necessary to support a *Brophy* claim. "[A]llegations of unusually large, suspiciously timed trades"[57] are informative.  Those

---

because she was motivated, in whole or in part, by the substance of that information.").

[56] *See* Pls.' Answering Br. at 20–25.  In the Complaint, Plaintiffs allege that the unresolved SEC comment letters and the Company's 2018 and 2019 10-Ks stating that there were no unresolved issues support a *Brophy* claim.  Plaintiffs, however, failed to preserve this argument in briefing and therefore waived it. *Emerald P'rs*, 726 A.2d at 1224.  That Plaintiffs asserted in the facts section of the answering brief that the SEC comment letters and the Company's purported failure to respond was material nonpublic information is insufficient to preserve any related arguments.

[57] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019).

allegations generally include timing,[58] overall size and relative size,[59] and inconsistency with prior trading patterns.[60] Plaintiffs argue that the timing and size of the sales are factors that support scienter here.[61]

Timing is always a key factor in a *Brophy* claim. At a minimum, the plaintiff must allege that the decision to trade must come after the fiduciary received the material information and before that information became public. Here, Plaintiffs define the relevant period as November 6, 2020 (the day after the Board authorized management to negotiate with Amazon) through at least January 19, 2021 (when Marsh sold $36.1 million worth of stock), and potentially as late as February 25, 2021, when the financial implications were fully disclosed.[62]

Even accepting Plaintiffs' November 6, 2020 through February 25, 2021 period as appropriate,[63] timing works against Plaintiffs. Of the challenged trades that

[58] *Id.* (identifying as a factor the timing of the trade, including the proximity between the trade and the time the defendants learn of material nonpublic information); *Guttman*, 823 A.2d at 504 (identifying as a factor the expiration date for any options or restrictions like lock-ups).

[59] *Guttman*, 823 A.2d at 504 (identifying as a factor the size of the trades relative to the defendant's overall stock holdings); *see also Oracle*, 867 A.2d at 954 (noting a defendant's sale as substantial despite the relative small percentage of his overall holdings).

[60] *Clovis*, 2019 WL 4850188, at *16 (noting as absent from the complaint "any well-pled facts that the trades at issue represented a deviation from the sellers' past trading practices").

[61] Plaintiffs distinguish *In re Clovis* on the basis that it is not the case here that the insider sales were consistent with the defendants' prior trading patterns. Pls.' Answering Br. at 32. But Plaintiffs do not plead any facts supporting this assertion.

[62] Pls.' Answering Br. at 1, 4, 17–18.

[63] This is generous. It is difficult to conclude that the mere decision to negotiate on November 6 was material, and that the trades made close to that time (even leaving

22

occurred during the period, many occurred under 10b5-1 plans locked in before the November 6 Board decision. Helmer's December 14 and 17 sales were made pursuant to a 10b5-1 plan effective August 19, 2020. And Kenausis's December 28 sale was made pursuant to a 10b5-1 plan effective September 10, 2020.[64] Plaintiffs argue that the court may not consider these directors' 10b5-1 plans at the pleading stage.[65] But those plans are disclosed in sufficiently reliable public filings of which the court may take judicial notice,[66] and Plaintiffs admit their existence in the Amended

---

aside the plan 10b5-1 issues described in this decision) were made based on that information. It is also hard to conclude that the Selling Defendants traded on information concerning the accounting charge, which was still being worked out through the relevant period. It is more reasonable to infer that the rise in stock prices that resulted in the Board decision to negotiate with Amazon is what motivated the large volume of insider trades. But that is a defense-friendly inference that the court does not, and need not, draw at this stage. The claims fail for other reasons.

[64] Defendants submitted as an exhibit to their opening brief publicly filed Form 4s showing that McNamee's November 2020 and January 2021 sales were also made pursuant to a 10b5-1 plan effective June 11, 2020. *See* Defs.' Opening Br., Ex. 35. Plaintiffs do not allege this in the Amended Complaint. This decision need not resolve the question of whether the court can look to this document on a Rule 23.1 motion because Defendants' arguments prevail regardless.

[65] *See* Pls.' Answering Br. at 28–29.

[66] *In re Hertz Glob. Hldgs., Inc. Sec. Litig.*, 2017 WL 1536223, at *22 n.10 (D.N.J. Apr. 27, 2017) (collecting cases), *aff'd*, 905 F.3d 106 (3d Cir. 2018); *see In re NutriSystem, Inc. Deriv. Litig.*, 666 F. Supp. 2d 501, 518 (E.D. Pa. 2009) (considering Rule 10b5-1 plans); *City Pension Fund for Firefighters & Police Officers in City of Mia. v. The Trade Desk, Inc.*, 2022 WL 3009959, at *17 n.147 (Del. Ch. July 29, 2022) (taking judicial notice of Form 4 filings).

Complaint.[67]  They are, therefore, fair game.  This knocks Helmer and Kenausis out because they do not face a substantial likelihood of liability from the *Brophy* claim.[68]

Because Plaintiffs advance demand futility arguments as to only the Selling Directors and because Plaintiffs' arguments fail as to at least two of those Defendants, Plaintiffs have failed to plead demand futility as to the *Brophy* claim, which is dismissed under Rule 23.1.

## B.    *Caremark*

Plaintiffs originally advanced a *Caremark* claim relating to the Restatement of Plug Power's historical financial statements for 2018, 2019, and the earlier quarters of 2020.  Plaintiffs alleged that the Plug Power Board failed to implement and

---

[67] *See* Am. Compl. ¶¶ 167 (noting Willis's, Kenausis's, and Helmer's November and December 2020 sales were made pursuant to 10b5-1 trading plans), 193–194 (noting Marsh's January 2021 sale was made pursuant to a 10b5-1 trading plan).  Plaintiffs' cases declining to consider 10b5-1 plans at the pleading stage are distinguishable.  Unlike in *In re Novavax Inc. S'holder Deriv. Litig.*, 2023 WL 5353171, at *15 (D. Md. Aug. 21, 2023), and *Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008), Plaintiffs here affirmatively allege when the trading plans went into effect.  *See* Am. Compl. ¶¶ 167, 194.  And unlike in *In re Infosonics Corp. Deriv. Litig.*, 2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007), Plaintiffs here allege that Kenausis's and Helmer's 10b5-1 trading plans went into effect before learning of any material nonpublic information.  Am. Compl. ¶ 167.

[68] *Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. June 14, 2016), *aff'd*, 155 A.3d 1283 (Del. 2017) ("Generally speaking, 10b5-1 plans offer a safe harbor for corporate insiders to sell stock by ceding trading authority to third parties with exclusive discretion to execute trades under certain pre-determined parameters.").  This logic extends to Silver's November 9, 2020 trade, which was made pursuant to a 10b5-1 plan effective September 14, 2020.  Am. Compl. ¶ 167.  Thus, even if the court ran the demand futility analysis for the *Brophy* claim as to the board in place when the original complaint was filed (*see supra* § II), and even if the court ignored that McNamee's November 9 sale was pursuant to a June 11 10b5-1 plan (*see supra* note 64), Plaintiffs' demand futility arguments would fail.

maintain an effective system of internal controls that caused the disclosure errors leading to the Restatement.[69]  Plaintiffs also alleged that Plug Power suffered "costs incurred from defending and paying any settlement or judgment in the class actions for violations of federal securities laws" arising from the Restatement.[70]  Then the District Court dismissed the Securities Action with prejudice, and Plaintiffs abandoned their Restatement-focused *Caremark* theory in their answering brief.

As explained in the answering brief, Plaintiffs' new *Caremark* theory focuses on the Board's information systems regarding insider trading policies and SEC comment letters, and the Board's monitoring of insider trading and management's response to the SEC comment letters.[71]

A *Caremark* claim "seeks to hold directors accountable for the consequences of a corporate trauma[.]"[72]  To adequately allege such a claim, a plaintiff must allege that the board had some level of involvement in the trauma.[73]  *Caremark* describes the test as requiring that the directors "knew or . . . should have known" about the risk leading to the trauma.[74]  *Stone* clarified that liability under *Caremark* requires

---

[69] Am. Compl. ¶¶ 228–261, 298–301, 313.

[70] *Id.* ¶ 300.

[71] *See* Pls.' Answering Br. at 34.

[72] *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also Horman v. Abney*, 2017 WL 242571, at *5 (Del. Ch. Jan. 19, 2017) ("*Caremark* claims inevitably arise in the midst of or directly following 'corporate trauma' of some sort or another."); *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (quoting *Pyott*).

[73] *Pyott*, 46 A.3d at 340.

[74] *Caremark*, 698 A.2d at 971.

a showing of bad faith—"that the directors knew that they were not discharging their fiduciary obligations."[75] At the pleading stage, the plaintiff must allege facts from which the court can reasonably infer that a fiduciary acted in bad faith.[76]

*Stone* identified two subspecies of *Caremark* claims. To state a *Caremark* claim, a plaintiff must allege particularized facts that establish either (1) "the directors utterly failed to implement any reporting or information system or controls, *or* [(2)] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[77] These two subspecies are colloquially referred to as prong-one and prong-two claims, or information-systems claims and red-flags claims.[78]

To adequately allege an information-systems claim, a plaintiff must plead with particularity that the directors completely failed "to implement any reporting or information system or controls[.]"[79] In the words of *Caremark*, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to

---

[75] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Pyott*, 46 A.3d at 340–41 (discussing the "actual knowledge" requirement of *Caremark* as clarified by *Stone*).

[76] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007)).

[77] *Stone*, 911 A.2d at 370 (emphasis in original).

[78] *See In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 363–64 (Del. Ch. 2023) (labeling first species of claims as "information-system" claims and second species as "red-flag" claims).

[79] *Marchand*, 212 A.3d at 821 (citing *Stone*, 911 A.2d at 370).

attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."[80]

When adopting a version of this quote as the prong-one standard, the *Stone* court was "quite deliberate" in endorsing the adverb "utterly"—a "linguistically extreme formulation" intended "to set a high bar when articulating the standard to hold directors personally liable for a failure of oversight under the first *Caremark* prong."[81] This high bar serves to gives boards a wide berth to exercise that discretion with respect to business risk. As the Delaware Supreme Court has reminded, "directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources."[82]

Although a board has great latitude in crafting and implementing its risk-monitoring and reporting system, "*Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."[83] To avoid rendering this bottom-line requirement "a chimera,"[84] this court must look beyond the mere existence of a system to some indicia of effectiveness when determining whether a

---

[80] *Caremark*, 698 A.2d at 971.

[81] *Fisher on Behalf of LendingClub Corp. v. Sanborn*, 2021 WL 1197577, at *11 (Del. Ch. Mar. 30, 2021) (quoting *Horman*, 2017 WL 242571, at *8 n.46).

[82] *Marchand*, 212 A.3d at 821.

[83] *Id.* (citations omitted).

[84] *Id.* at 824.

board made the required good-faith effort.[85] The court must evaluate, for example, whether the system functions in earnest, as oversight requires more than just "go[ing] through the motions."[86] Moreover, the system must be "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board . . . to reach informed judgments concerning both the corporation's compliance with law and its business performance."[87]

The Delaware Supreme Court clarified in *Marchand* that a reasonably designed monitoring and reporting system, at a minimum, addresses "essential and mission critical" risks.[88] In *Marchand*, the Supreme Court reasoned that food safety

---

[85] *See, e.g.*, *Hughes v. Hu*, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) ("The mere existence of an audit committee and the hiring of an auditor does not provide universal protection against a *Caremark* claim."); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013) (holding that the plaintiff had adequately alleged a *Caremark* claim, despite the existence of an audit committee and independent auditor, where the company had no "meaningful controls in place").

[86] *Compare In re Massey Energy Co.*, 2011 WL 2176479, at *19 (Del. Ch. May 31, 2011) (crediting inference that independent directors were "go[ing] through the motions" instead of "mak[ing] good faith efforts" to ensure compliance), *and Pyott*, 46 A.3d at 356 (noting that "[t]he appearance of formal compliance cloaked the reality of non-compliance" when "directors who understood the difference between legal off-label sales and illegal off-label marketing continued to approve and oversee business plans that depended on illegal activity") (citing *Massey*), *with Horman*, 2017 WL 242571, at *8 (rejecting inference that "Director Defendants were 'merely going through the motions' in monitoring [the company's] compliance obligations").

[87] *Caremark*, 698 A.2d at 970.

[88] *Marchand*, 212 A.3d at 824.

was a central compliance risk to Blue Bell, a monoline ice cream company in a heavily regulated industry.[89]

Oversight obligations under *Caremark*, however, do not cease beyond what is mission critical, as Vice Chancellor Laster observed in *In re McDonald's Corporation Shareholder Derivative Litigation*.[90]  What Delaware courts look for are information systems designed to address "central compliance risks."  Although it is fair to infer that all "essential and mission critical risks" qualify as "central compliance risks," it is also possible that some "central compliance risks" may not reach the level of "essential and mission critical."[91]  When directors make no effort to establish an information system to address central compliance risks, then that failure supports an inference of bad faith.[92]

To adequately allege a red-flag claim, a plaintiff must plead "particularized facts that the board knew of red flags but consciously disregarded them in bad faith."[93]  The intuitive notion underlying the red-flags theory is that "sophisticated and well-advised individuals like corporate directors do not customarily concede violations of positive law," and so a plaintiff must plead facts and circumstances

---

[89] *Id.* at 809–11.

[90] 291 A.3d at 678.

[91] *Id.*

[92] *Id.* at 679.

[93] *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020).

sufficient for a court to infer this conduct.[94]  "[A] *Caremark* plaintiff can plead that 'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties."[95]  In other words, a claim that a board "had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning."[96]

For a red-flag theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith.  The relationship between the red flag and the corporate trauma cannot be too attenuated.[97]  Former Vice Chancellor Glasscock has described the requirement as one of "proximate cause," stating that "the corporate trauma in question must be sufficiently similar to the misconduct implied by the red flags such that the board's bad faith, conscious inaction proximately caused that trauma."[98] The question at the pleading stage is whether it is reasonably conceivable that the

---

[94] *South v. Baker*, 62 A.3d 1, 14–15 (Del. Ch. 2012); *see also In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015) (observing that red flags "are a proxy for pleading knowledge").

[95] *David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006) (footnote omitted).

[96] *Id.*

[97] *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010).

[98] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *15 (Del. Ch. Dec. 18, 2017) (internal quotation marks omitted) (citing *Jacobs*, 2016 WL 4076369, at *8).

identified red flag would have placed a reasonable observer on notice of the risk of the corporate trauma that ensued.

Plaintiffs advance both types of *Caremark* claims here, both as to the SEC comment letters and the insider trading issues.

### 1. SEC Comment Letters

The SEC sent comment letters focused on the Company's Forms 10-K for the 2018, 2017, and 2019 fiscal years, Form 10-Q for the quarterly periods ending June 30, 2018, and Forms 8-K filed August 9, 2018, March 7, 2019, and November 9, 2020. The comment letters inquired into the following, among other things:

- Discussing revenue and gross profit on a gross basis excluding the effects of the provision for the fair value of warrants issued as sales incentives;

- Presenting non-GAAP measures that substitute individually tailored revenue recognition and measurement methods for those of GAAP;

- Presenting revenue by line item and in total, excluding the provision for the fair value of warrants issued as sales incentives;

- Presenting non-GAAP measures with greater prominence than the directly comparable GAAP measure, or failing to discuss the comparable GAAP measure at all;

- Describing adjusted EBITDA as purely a liquidity metric, not a performance measure;

- Excluding cash flow effects associated with changes in working capital from the adjusted EBITDA measure, which was inconsistent with presenting it as a liquidity measure and potentially misleading investors; and

- Lease accounting and accounting for lease financing implicating Plug Power's application and presentation of Topic 842, including "right of use" accounting issues.[99]

As to the SEC comment letters, Plaintiffs primarily advance an information-systems claim. They contend that the documents produced to them under Section 220 of the DGCL, including the Audit Committee charter, "reflect no good faith effort to create a board-level monitoring system in place for the SEC comment letters."[100]

Plaintiffs concede that the Company responded to the SEC comment letters.[101] Plaintiffs also concede that the Audit Committee received reports concerning the SEC comment letters.[102] And Plaintiffs do not dispute that the Audit Committee's charter covered risks associated with the SEC comment letters. Still, they advance two arguments.

First, they say that SEC comment letters generally present a distinct risk that requires its own monitoring system beyond the ambit of the Audit Committee. (Or perhaps they believe these risks warrant specific language in the Audit Committee's charter? Plaintiffs' theory is not totally clear.) Delaware law does not dictate what

---

[99] Am. Compl. ¶¶ 105, 107, 112–113, 115, 119.

[100] Pls.' Answering Br. at 37.

[101] Am. Compl. ¶¶ 100–101, 114, 116, 118, 131, 160.

[102] Pls.' Answering Br. at 8–9, 38–39. Plaintiffs claim that the Company should have had a reporting system that elevated each SEC comment letter to the full Board. *Id.* at 40. But committees "exercise business judgment in determining what issues should be brought from the subcommittee to the full Board," and "[i]t is not indicative of an utter failure of reporting and control for the Board to delegate risk assessment to [a subcommittee], and then fail to demand an accounting of a particular business risk." *Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *13 (Del. Ch. Sept. 6, 2022), *aff'd,* 297 A.3d 1083 (Del. 2023).

structure a reporting system must take.  Rather, under Delaware law, "how directors choose to craft a monitoring system in the context of their company and industry is a discretionary matter."[103]  That is, the law requires courts to exercise good faith oversight, "not to employ a system to the plaintiffs' liking."[104]

Second, Plaintiffs argue that the Audit Committee discussions were not sufficiently robust.  They point to documents they received through their pre-suit investigation, which they say reveal scant discussion of the SEC comment letters during Audit Committee meetings and even less discussion at the Board level during the relevant three-year period.  But the "absence of regular board-level discussions on the relevant topic" "alone is not enough for the [c]ourt to conclude a board of directors acted in bad faith."[105]  That Plaintiffs disagree with the adequacy of the Audit Committee's or Board's consideration of the SEC comment letters does not mean that the Board failed to make a good-faith effort to establish a system.[106]

It bears noting that Plaintiffs' *Caremark* allegations were particularly underdeveloped.  One can imagine a situation where the absence of any discussion on a central compliance risk in Board or committee minutes is sufficient to supply the

---

[103] *Clem v. Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) (citing *Marchand*, 212 A.3d at 821).

[104] *Id.*

[105] *Bricklayers Pension Fund of W. Pa. on behalf of Centene Corp. v. Brinkley*, 2024 WL 3384823, at *15 (Del. Ch. July 12, 2024) ("Plaintiff has not painted the extreme picture present in *Marchand* and *Boeing*.").

[106] *See McDonald's*, 291 A.3d at 679 ("Outside of central compliance risks, including essential or mission critical risks, a plaintiff will have difficulty rebutting the business judgment rule where officers or directors have made a good faith decision regarding the level of monitoring resources, if any, to assign to a risk.").

inferences that Plaintiffs seek, at least where the risks are more severe and the absence of discussion far more glaring. But this case was an afterthought to the Securities Action. And the *Caremark* claim was an afterthought to the *Brophy* claims. And the Amended Complaint reflects all of this—facts shoved into the boxes of belatedly raised theories. The inferences just were not there.

Plaintiffs also advance a red-flag theory regarding the SEC comment letters, and it also falls short. Plug Power received five comment letters between September 2018 and February 2021, but none threatened legal action. Threatening legal action is no precondition to serving as a red flag. Still, it is hard to construe these letters as red flags based on the text of the letters.[107]

Even if the SEC comment letters constituted red flags, it is not reasonable to conclude based on the facts alleged that the Board ignored them in bad faith. (Did the Board see them? Plaintiffs argue that the Board did not see them for purposes of their information-systems claim.) In any event, the system in place worked to some degree—the Company responded promptly to each of them[108] and the Audit

---

[107] *Cf. Reiter on Behalf of Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at \*13 (Del. Ch. Oct. 18, 2016) (rejecting plaintiffs' argument that five reports provided to the directors constituted a series of red flags that should have triggered a duty for the board to act, including because the pled facts did not warrant an inference that the directors were knowingly complicit in a strategy to pursue profits by employing illegal means).

[108] Except the facts concerning the Company's response to the February 10, 2021 letter are unclear. *See supra* note 12. Given the Company's prompt response to the first four SEC comment letters, the absence of information concerning the February 10 letter does not tip the scale.

Committee received reports about them.[109] If what the standard is in search of is a bottom-line requirement, that is satisfied.

Plus, the red flags must indicate misconduct similar enough to the corporate trauma at issue such that the board's bad faith, conscious inaction proximately caused that trauma.[110] Even assuming for purpose of the analysis that Plaintiffs adequately pled a corporate trauma, they have not proffered any theory that connects the dots between the Board's alleged conduct and that harm. If the Restatement was the corporate trauma, a theory which Plaintiffs have backed away from, then it is not easy to connect the sprawling set of issues discussed in the SEC comment letters to that specific corporate trauma.

Because Plaintiffs failed to state an information-systems or red-flags claim under *Caremark* with respect to the SEC comment letters, this claim is dismissed under Rule 12(b)(6).

### 2. Insider Trading

The Company's Insider Trading Policy prohibits any director, officer, or employee from trading in the securities of the Company while in the possession of material nonpublic information about the Company. An exception to this general prohibition is for trades effected pursuant to a Rule 10b5-1 plan that has been pre-approved by the Company's Compliance Officer. The Audit Committee periodically

---

[109] Pls.' Answering Br. at 8–9, 38–39 (citing Defs.' Opening Br., Exs. 5 and 23).

[110] *Corbat*, 2017 WL 6452240, at *15 (internal quotation marks omitted) (citing *Jacobs*, 2016 WL 4076369, at *8).

reviewed the Insider Trading Policy and also reviewed significant unusual transactions.

Plaintiffs allege that the Board did not have a system to monitor compliance with the Insider Trading Policy.[111] Defendants point to the Company's Insider Trading Policy, the Audit Committee's periodic review of the policy, and the Audit Committee's review of significant unusual transactions, and the court may consider all of this information at the pleading stage.[112] In response, Plaintiffs attempt to shift the burden to Defendants, asserting that they cite "no documentary evidence that even implies the board monitored certain insider trading."[113] But there was a Board-approved policy. The large volume of insider trades is not evidence that it was violated. Plaintiffs cannot show an "utter failure" to monitor trading under these circumstances.

Plaintiffs also advance a red-flags claim based on the insider trading allegations, recasting one of their *Brophy* arguments as a *Caremark* claim. Plaintiffs point to Roth's November 13, 2020 sale (through FiveT Capital Holdings) and Marsh's January 19, 2021 sale, arguing that the sales were substantial relative to the Selling Directors' overall stock holdings such that they should have "warrant[ed] a red flag for board review."[114] Plaintiffs do not allege that these sales violated Plug Power's

---

[111] Am. Compl. ¶¶ 46–47, 278; Pls.' Answering Br. at 41.

[112] Defs.' Opening Br. at 41–42.

[113] Pls.' Answering Br. at 42.

[114] *Id.* at 46.

insider trading policy. Nor do Plaintiffs allege that Marsh's sale was inconsistent with his prior trading practices such that it would have been a red flag.[115]

That large stock sales occurred alone is insufficient to constitute red flags indicating fraud or criminal conduct. And as with Plaintiffs' SEC comment letters red-flags claim, Plaintiffs also fail to allege any type of corporate trauma resulting from the purported insider trades, which is a predicate to a *Caremark* claim.[116]

Because Plaintiffs' arguments fail as to the *Caremark* insider trading claim, this claim is dismissed under Rule 12(b)(6).

### C. Unjust Enrichment

Plaintiffs' Unjust Enrichment claim depends on the *Brophy* claim. Because Plaintiffs have failed to state a *Brophy* claim,[117] Plaintiffs' Unjust Enrichment claim also fails.

## III. CONCLUSION

Defendants' motion to dismiss is granted.

---

[115] And Plaintiffs could not have alleged this, as Marsh sold more shares between April and October 2020 than he did between November 2020 and January 2021. Defs.' Opening Br., Ex. 36; *see supra* note 66.

[116] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1183 (Del. Ch. 2024) ("Before a plaintiff can invoke [a theory based on *Caremark*], the plaintiff must point to some sufficiently concrete corporate injury.").

[117] Plaintiffs also did not brief the Unjust Enrichment claim and therefore waived it. *Emerald P'rs*, 726 A.2d at 1224.